Per Curiam.
{¶ 1} This is an original action pursuant to Article II, Section lg of the Ohio Constitution, challenging the petition signatures submitted in support of the “Ohio Drug Price Relief Act” by respondents members of the committee of Ohioans for Drug Price Relief Act, William S. Booth, Daniel L. Darland, Tracy L. Jones, and Latonya D. Thurman (collectively, “the committee”). The challengers are the Ohio Manufacturers’ Association, Ohio Chamber of Commerce, Pharma- . ceutical Research and Manufacturers of America, Keith A. Lake, and Ryan R. Augsburger (collectively, “OMA”).
{¶ 2} For the reasons set forth below, we sustain the challenge in part. We hold that 10,303 signatures, including the signatures on all part-petitions circulated by Roy Jackson and Kacey Veliquette, were erroneously validated.
Background
{¶ 3} On December 22, 2015, the committee submitted approximately 10,029 part-petitions, purportedly containing 171,205 signatures, to the office of Ohio Secretary of State Jon Husted in support of an initiative to enact the “Ohio Drug Price Relief Act” as Section 194.01 of the Ohio Revised Code. Husted transmitted the part-petitions to the county boards of elections for verification of the signatures pursuant to R.C. 3501.11(K). He also sent Directive 2015-40, dated December 23, 2015, which instructed the county boards how to review, examine, and verify the petition signatures. In the directive, Husted ordered the county boards to return their certification forms to his office no later than 12:00 p.m. on December 30, 2015.
{¶ 4} To qualify an initiative for the ballot, supporters must submit petitions that satisfy two criteria. First, the petitions must contain a number of valid *251 signatures that is equal to at least 3 percent of the total number of electors. Ohio Constitution, Article II, Section lb. Evidence in the record establishes that at present, the minimum number of valid signatures is 91,677. Second, the petition must contain valid signatures equal to at least one-half of the 3 percent threshold number (that is, 1.5 percent of the total number of electors) from at least 44 of Ohio’s 88 counties. Ohio Constitution, Article II, Section lg. As of the December 30, 2015 deadline, the county boards had reported a sufficient total number of valid signatures and a sufficient number of valid signatures in enough counties to meet both constitutional requirements.
{¶ 5} Upon verifying a sufficient number of signatures, the secretary of state is required to transmit the proposed statute and initiative petitions to the General Assembly, as soon as it convenes, for consideration. Ohio Constitution, Article II, Section lb. The first day of the General Assembly’s 2016 session occurred on Monday, January 5. But despite having received sufficient verifications, Husted did not transmit the petitions to the legislature at the start of the session.
{¶ 6} Instead, on January 4, 2016, he issued Directive 2016-01, returning the part-petitions to the county boards with instructions to again review two aspects of them. First, the directive ordered the boards to determine whether petition signatures were improperly removed (i.e., crossed out) by unauthorized persons. And second, the directive ordered the boards to investigate whether circulator statements were invalid due to systematic signature overreporting (i.e., preaffix-ing the number of signatures purportedly witnessed by the petition circulators to part-petitions containing fewer actual signatures). Husted ordered the boards to complete this review and recertify their results by January 29, 2016.
{¶ 7} On February 4, 2016, Husted advised the committee that the petition contained 96,936 valid signatures, more than the 91,677 required. He also advised the committee that signatures from 47 counties met the constitutional threshold (more than the required 44) and that the constitutional requirements were “fully satisfied.” He transmitted the initiative and petition to the General Assembly.
Procedural History
{¶ 8} On February 29, 2016, OMA commenced this original protest action. The protest complaint identified three defects[1] in the part-petitions which, OMA alleged, should cause them to be discounted in their entirety:
*252 1. Contractors crossed out signatures on part-petitions, in violation of R.C. 3519.06(C).
2. Some petition circulators listed nonresidential addresses as their permanent addresses, in violation of R.C. 3501.38(E)(1).
3. More than 1,400 part-petitions contain false circulator statements because they contain fewer signatures than the circulator attested to witnessing, in violation of R.C. 3501.38(E) and 3519.06(D).
OMA requested an “order and/or judgment declaring” the part-petitions and signatures thereon invalid, and an “order and/or judgment” that the petition failed to meet the requirements of Article II, Section lb.
{¶ 9} We issued an opinion denying the committee’s motion for judgment on the pleadings, 147 Ohio St.3d 42, 2016-Ohio-3038, 59 N.E.3d 1274, and on June 1, 2016, OMA made an equivocal request for an evidentiary hearing, stating that the challengers “will not know for certain whether they need an evidentiary hearing until outstanding discovery is completed.” OMA never renewed this request and on August 15, 2016, withdrew the request.
{¶ 10} On May 13, 2016, OMA filed a motion for partial summary judgment. We deny that motion as moot. The parties have submitted merit briefs and evidence, and the case is ripe for adjudication on the merits.
Analysis of the Alleged Petition Defects

First Allegation: Signature Deletions

{¶ 11} Ashland County part-petition No. 000007 is a typical example of a signature deletion. The statement of circulator Larry Boyce indicates that he witnessed 28 signatures. And indeed, Ashland County part-petition No. 000007 has a signature on each of its 28 lines. However, one signature, on line 2, has been blacked out with a marker. In its review, the board of elections determined that two signatures—those on lines 4 and 21—were invalid. The board therefore certified 25 valid signatures. The principal claim in this protest is that Ashland County part-petition No. 00007, and thousands of similar part-petitions, should be invalidated in their entirety, based on the theory that someone other than the circulator or signer blacked out at least one signature.
{¶ 12} We reject this aspect of the challenge.
{¶ 13} The Revised Code affirmatively permits three persons to delete a signature from a petition, so long as the deletion occurs before the petition is filed: (1) the circulator, (2) the signer, or (3) the “attorney in fact” for any signer. R.C. 3501.38(G) and (H). OMA contends that the blacking out of signatures on Ashland County part-petition No. 00007 and other part-petitions was done by *253 unauthorized persons and that this defect renders all of those part-petitions invalid.
{¶ 14} OMA’s merit brief relies primarily on the testimony of Pamela Lauter, who coordinated some of the petition circulators. Lauter described a process that she called “purging the deck,” which involved persons other than the circulators reviewing the part-petitions after the circulators had turned them in and removing invalid signatures by highlighting them with a black, washable magic marker, not crossing them out. But she insisted that the signatures remained visible after the highlighting and denied ever using a black “Sharpie” marker that would have made the signatures unreadable. Unfortunately, the specific “highlighted” part-petitions she discussed were not identified for the record.
{¶ 15} Other evidence confirms that the circulators were not responsible for the deletions of this type. Four petition circulators, Vikki Moore, Marquita Barnhouse, Gloria Torrence, and Rebecca Douglas, denied crossing names off the part-petitions they circulated. And Angelo Paparella, president and owner of PCI Consultants, Inc., the head contractor for the petition drive, testified that PCI operates an out-of-state processing center at which validators review the part-petitions and strike out invalid signatures before returning the part-petitions to the client.
{¶ 16} The evidence therefore shows that signature deletions occurred that were not authorized by R.C. 3501.38(G) and (H). But OMA is mistaken in its belief that the remedy for such a violation is to invalidate the entire part-petition.
{¶ 17} The limited grant of authority to remove a signature serves two purposes: it protects the ability of petition signers to change their minds and remove their signatures, so long as they do so in a timely manner. And it protects circúlators from the potential Hobson’s choice that would arise if they discover that a petition signature is invalid: either (1) submit a false R.C. 3501.38(E)(1) circulator statement attesting that all the petition signatures are, to the best of the circulator’s knowledge and belief, valid or (2) forego the entire part-petition with all its valid signatures. R.C. 3501.38(G) permits the circulator to avoid this dilemma by striking the invalid signature and adjusting the signature count accordingly. See Rust v. Lucas Cty. Bd. of Elections, 108 Ohio St.3d 139, 2005-Ohio-5795, 841 N.E.2d 766, ¶ 14.
{¶ 18} By implication, R.C. 3501.38(G) and (H) give notice that only circulators, signers, and authorized representative may strike signatures. This tacit limitation guards an even more fundamental interest: it protects electors who sign petitions from having their signatures surreptitiously deleted, as Husted acknowledged in Directive 2016-01 when he ordered the boards to investigate the deletions:
*254 Most importantly, [these statutes] serve to protect the registered Ohio voters exercising their right under the state constitution to petition state government (in this case, to propose a state law for consideration by the General Assembly) from having their signature improperly removed from a part-petition.
To return to the example of Ashland County part-petition No. 00007, the logical remedy for an unauthorized deletion would be to count the crossed-out signature (assuming it is otherwise valid), not to invalidate the 25 indisputably valid signatures from eligible voters. Adopting OMA’s position would have the perverse effect of rewarding a petition opponent when a part-petition has been unlawfully altered.
{¶ 19} Petition proponents, who want to submit as many valid signatures as possible, have no incentive to delete signatures improperly. Certainly OMA has identified no theory as to how petition advocates would benefit from making unauthorized cross-outs or how such a practice jeopardizes the interests discussed above. According to Lauter, circulation coordinators highlighted signatures for “payroll purposes,” that is, to avoid paying circulators for invalid signatures on the front end, rather than having to “charge-back” the expense. Indeed, the Butler County Board of Elections reported after the re-review that 79.59 percent of the marked-out signatures were facially invalid and would have been declared invalid by the board if they had not already been stricken.
{¶ 20} Invalidating the entire part-petition because of an unauthorized deletion would serve no public interest and would turn the implicit protection afforded by R.C. 3501.38(G) and (H) on its head. For this reason, we also reject OMA’s claim that the part-petitions should be invalidated under R.C. 3501.39(A)(3) on the grounds that they violate the requirements of R.C. Chapter 3501.
{¶ 21} R.C. 3501.38(G) and (H) do not expressly state that a part-petition containing an unauthorized deletion is invalid. So for legal authority, OMA turns to R.C. 3519.06, which provides:
No initiative or referendum part-petition is properly verified if it appears on the face thereof, or is made to appear by satisfactory evidence:
(A) That the statement required by section 3519.05 of the Revised Code is not properly filled out;
(B) That the statement is not properly signed;
(C) That the statement is altered by erasure, interlineation, or otherwise;
*255 (D) That the statement is false in any respect;
(E) That any one person has affixed more than one signature thereto.
OMA asserts that the deletion of signatures violated R.C. 3519.06(C), rendering any part-petition containing deleted signatures invalid in toto.
{¶ 22} The flaw in this argument is that the phrase “the statement,” as used throughout the election code, is a term of art: it refers specifically to the circulator’s attestation as to the number and validity of signatures on the part-petition. And the signature pages are not part of the attestation statement.
{¶ 23} The term “statement” first appears in Article II, Section lg of the Ohio Constitution, which mandates that “[t]o each part of such petition shall be attached the statement of the circulator, as may be required by law, that he witnessed the affixing of every signature.” It also appears in R.C. 3501.38(E)(1): “On each petition paper, the circulator * * * shall sign a statement,” under penalty of election falsification, that (1) the circulator witnessed the affixing of every signature, (2) all signers were to the best of the circulator’s knowledge and belief qualified to sign, and (3) every signature is to the best of the circulator’s knowledge and belief the signature of the person whose signature it purports to be or of the person’s attorney in fact. R.C. 3519.06(C), which prohibits alterations to “the statement,” plainly does not apply to the signature pages because those pages are not part of the circulator statement described in Article II, Section lg and R.C. 3501.38(E)(1).
{¶ 24} OMA would have us hold that R.C. 3519.06(C) prohibits alterations to any portion of the petition, not just the circulator’s statement. OMA’s argument is as follows: R.C. 3519.06(A) provides that a petition is invalid if “the statement required by section 3519.05 of the Revised Code is not properly filled out”; R.C. 3519.05 offers model language for a complete part-petition, including the signature pages as well as the circulator’s statement; and by using the phrase “the statement required by section 3519.05 of the Revised Code,” the General Assembly meant to prohibit alterations to any portion of the part-petition.
{¶ 25} But OMA’s statutory construction would create redundancies and contradictions in the Revised Code. If R.C. 3519.06(A) means that a part-petition is invalid if any portion of the petition is improperly filled out, then R.C. 3519.06(E), making a petition invalid if it contains two signatures from the same person, is redundant. And if R.C. 3519.06(C) imposes a blanket prohibition on alterations to the signature pages, then it conflicts with R.C. 3501.38(G) and (H), discussed above, which expressly authorize alterations to the signature pages.
{¶ 26} It is generally our obligation to defer to the secretary of state’s reasonable interpretation of an election statute. State ex rel. Cornerstone Developers, Ltd. v. Greene Cty. Bd. of Elections, 145 Ohio St.3d 290, 2016-Ohio- *256 313, 49 N.E.3d 273, ¶ 16. However, Husted has vacillated on his interpretation of this statute.
{¶ 27} When first confronted with the deletions, he did not invalidate the part-petitions, even though under OMA’s theory, they were defective on their faces. Consider, for example, Madison County part-petition No. 000024. The circulator attested to witnessing four signatures, and indeed lines one through four contain signatures. But someone ran a black line through the signatures on lines one and three, and the board of elections validated the other two signatures. So either someone other than the circulator struck two signatures or the circulator crossed them out and then misreported the number of signatures in his statement. Either way, if Husted had agreed with OMA’s legal position, then he should have declared part-petitions of this type to be invalid. But he did not do so.
{¶ 28} Instead, he ordered the boards to conduct their re-review, but, of critical importance, he did not instruct the boards to disqualify petitions containing unauthorized deletions. In fact, he gave no clear guidance on that point. The guidance that he did provide, in Directive 2016-01, quoted above, strongly suggested that unauthorized deletions pose a problem because they potentially remove valid signatures that should be counted—not because they invalidate the entire part-petitions that contain them.
{¶ 29} But then, at the conclusion of the re-review, Husted appears to have changed his position. He took the extraordinary step, based on Lauter’s testimony about “purging the deck,” of unilaterally invalidating every part-petition circulated in Cuyahoga County by DRW Campaigns, L.L.C., and Ohio Petitioning Partners, L.L.C. And he explained his decision by using the legal reasoning urged by OMA. He also endorsed OMA’s statutory construction in his memorandum in response to the committee’s motion for judgment on the pleadings. Given this history, we hold that the secretary of state has not announced a definitive statutory interpretation that warrants our deference.
{¶ 30} In addition, this aspect of OMA’s challenge fails for lack of evidence. OMA’s complaint asserts that there are signature strike-throughs on approximately 5,598 part-petitions. The strike-through problem regarding 4,579 of those part-petitions allegedly invalidates 63,759 signatures, according to a spreadsheet prepared by a litigation-support manager of the law firm representing OMA. But OMA has not submitted evidence regarding who deleted those signatures. This evidence would not be difficult to compile: if the number of signatures reported by the circulator in the statement includes the lines blacked out, then the logical inference is that someone else deleted the signatures after the part-petition left the circulator’s hands. But OMA has not done such an analysis. Rather, it merely asks the court to create a conclusive presumption of invalidity, one that *257 would discard tens of thousands of valid signatures affixed by Ohio voters. We decline to do so.
{¶ 31} This decision is consistent with Husted’s own actions at the end of the re-review. He invalidated signatures only from Cuyahoga County because he concluded that he “lack[ed] sufficient evidence to invalidate part-petitions beyond those in Cuyahoga County where the testimony was actually presented.” The evidence in the record before us is no stronger than the evidence available to the secretary of state, at least with respect to signatures collected in Franklin County, in Hamilton County, and throughout the state. For example, when Paparella, the head contractor for the petition drive, was shown copies of sample part-petitions during his deposition, he was unable to tell just from the ink used whether the strike-outs were done by employees at the processing center or were done by the circulators in the field or by field managers.
{¶ 32} We reject OMA’s first signature challenge.

Second Allegation: False Circulator Addresses

{¶ 33} OMA also challenges the number of valid signatures on the ground that four circulators allegedly submitted false information in their circulator statements. R.C. 3501.38(E)(1) requires petition circulators to execute a statement on each part-petition containing, among other information, “the circulator’s name, the address of the circulator’s permanent residence, and the name and address of the person employing the circulator to circulate the petition, if any.” (Emphasis added.) According to OMA, circulators Fifí Harper, Kelvin Moore, Roy Jackson, and Kacey Veliquette violated this provision by providing addresses that were not “permanent residences,” and as a result, the part-petitions they circulated should be invalidated in their entirety. We agree as to two of the four circulators.

Fifi Harper

{¶ 34} Harper was hired in 2015 to circulate part-petitions for the committee. On these part-petitions, she listed her address as “4022 East Greenway Road, # 11312 Phoenix, Arizona 85032” (“the Greenway address”). According to evidence submitted by OMA, the Greenway address is for “Pack Ship and Print Center,” a business in a “strip plaza.” Harper concedes in an affidavit that the Greenway address is a business facility that hosts mailboxes. The affidavit of the owner of the business at the Greenway address confirms that the building is not residential, that Harper does not live there, and that she rented mailbox no. 312 in August 2015.
{¶ 35} The requirement that a circulator provide a permanent address serves the important function of ensuring that a board of elections can contact the circulator in the event that complications arise during the verification process. See In re Protest of Brooks, 155 Ohio App.3d 370, 2003-Ohio-6348, 801 N.E.2d *258 503, ¶ 46 (3d Dist.) (stating that one reason petition circulators are required to state the address of the person or entity compensating them is so that the payor can be contacted if complications arise in the verification process). The evidence in the record demonstrates that Harper met this requirement. The mailbox at the Greenway address is, according to Harper, “the only location at which I can be contacted that is of a permanent, on-going nature” and “the only place from which when I am absent I have a specific present intention to return.” We therefore decline to invalidate the part-petitions that Harper circulated.

Kelvin Moore

{¶ 36} Moore’s declared address on part-petitions he circulated was 3143 West 33rd Street, Cleveland, Ohio. OMA submitted an affidavit from a private investigator, who states that “Dave” told him that he (Dave) owns the property, that only businesses are located there, and that no one named Kelvin Moore resides there. In a second affidavit, a process server states that he rang the buzzer for a suite in the secured building and a woman told him over the intercom that there was no Kelvin Moore in the building. Both affidavits constitute inadmissible hearsay. Because there is no admissible evidence in the record to impugn the address Moore gave, we decline to invalidate the part-petitions he circulated.

Roy Jackson and Kacey Veliquette

{¶ 37} Jackson listed his address on part-petitions he circulated as 2100 Brice Road, Reynoldsburg, Ohio. That address is the location of a Days Inn and Suites. Records from the Days Inn and Suites show that Jackson was a guest there in October 2015. The address Veliquette stated on the part-petitions she circulated was 1900 S. Ocean Blvd., Myrtle Beach, South Carolina. That address is the location of the Shady Rest Motel, which has no record of a person named Kacey Veliquette staying at the motel in 2015 or 2016 or being a permanent resident there. Therefore, the evidence establishes that Jackson and Veliquette listed nonpermanent, nonresidential addresses on their circulator statements.
{¶ 38} Rather than dispute this conclusion, the committee challenges the constitutionality of R.C. 3501.38(E)(1).[2] According to the committee’s evidence, professional petition circulators often do not maintain a permanent residence, due to the nomadic nature of their work. For example, Harper attests that she has no permanent address due in large part to the constant travel associated with her *259 employment as a professional petition circulator. Based on this evidence, the committee asserts that R.C. 3501.38(E)(1) is unconstitutional because it prevents transients from circulating petitions.
{¶ 39} But while the record contains evidence establishing Harper’s lack of a permanent residence and her establishment of a permanent mailing address, it contains no comparable evidence of Jackson’s residential status. Thus, a factual predicate for an as-applied constitutional challenge to the statute has not been established.
{¶ 40} The record contains an affidavit from Yeliquette explaining that she, too is a transient circulator. And her affidavit explains why she chose to put the address of the Shady Rest Motel on her circulator statement. But it does not establish that she could actually be contacted at that location. Therefore,' her part-petitions could be deemed valid only if we were to rule that it is unconstitutional to require circulators to provide some means of locating them. To the contrary, we hold that such a requirement is a sufficient state interest to justify the statute under any level of scrutiny.
{¶ 41} We therefore hold that the part-petitions circulated by Jackson and Veliquette should not have been validated, and we invalidate all of the signatures contained on those part-petitions.

Third Allegation: Signature Overcounting

{¶ 42} R.C. 3501.38(E)(1) requires petition circulators to indicate the number of signatures on each petition paper and to sign an attestation that they personally witnessed each signature. A part-petition is not “properly verified” if “it is made to appear by satisfactory evidence * * * [t]hat the statement is false in any respect.” R.C. 3519.06(D).
{¶ 43} The evidence establishes a substantial problem of overcounting. As an example, Allen County part-petition no. 000005 contains six signatures, five of which the board of elections counted as valid. The remaining 22 signature lines are blank. But the circulator statement indicates that the circulator witnessed 28 signatures. In addition, multiple circulators during hearings before boards of elections looked at part-petitions that they themselves had circulated and testified that the stated number of witnessed signatures—in those situations, as in this example, 28—was not in their handwriting.
{¶ 44} The requirement that a circulator state the number of signatures personally witnessed “is a protection against signatures being added later.” State ex rel. Loss v. Lucas Cty. Bd. of Elections, 29 Ohio St.2d 233, 234, 281 N.E.2d 186 (1972) (invalidating a candidate part-petition when the line indicating the total number of signatures witnessed was left blank). We are not dealing here with a case of minor or negligent miscounts. Systemic overcounts of the *260 magnitude seen in this case are an open invitation to fraud and make this case different from all previous cases cited by the parties. Because a board of elections has no way to know how many signatures the circulators actually witnessed, there is no guarantee that someone did not later add the signatures of legitimate electors who did not choose to sign (or did not even know that their names were being placed on the petition). And of course, a part-petition of this type is invalid because, on its face, the attestation of the circulator is false: he or she did not witness the number of signatures indicated.
{¶ 45} We therefore invalidate the part-petitions with overcounts, as specified in the next section.
Remedy
{¶ 46} For the reasons stated above, we deny OMA’s motion to strike and deny OMA’s motion for partial summary judgment as moot. Consistent with our opinion, we invalidate 297 signatures on the part-petitions submitted by Roy Jackson. We invalidate 632 signatures on the part-petitions submitted by Kacey Veliquette. And as to the part-petitions with overcounts, we invalidate 9,374 signatures.[3] In total, OMA has demonstrated that 10,303 signatures that were counted as valid should not have been counted. The petition therefore contained 86,633 valid signatures, which means that it was short of the 91,677 signatures required by 5,044 signatures.
(¶ 47} Pursuant to Article II, Section lg of the Ohio Constitution, the committee has until Thursday, August 25, 2016 (ten days from the date of this order), to submit a sufficient number of valid signatures to the secretary of state. If the secretary of state certifies enough valid signatures, then he shall resubmit the initiative to the General Assembly, in accordance with the terms of Ohio Constitution, Article II, Section lb.
Motions denied and challenge sustained in part.
French, J., concurs, with an opinion.
O’Connor, C.J., concurs in part and dissents in part, with an opinion.
O’Donnell, J., concurs in part and dissents in part, with an opinion joined by Kennedy, J.
*261 Lanzinger, J., concurs in part and dissents in part, and would sustain the challengers’ first allegation and sustain the challengers’ second allegation as to all four circulators.
O’Neill, J., concurs in part and dissents in part, with an opinion.
Pfeifer, J., dissents, with an opinion.

. OMA. also alleged that five circulators of part-petitions were felons and were therefore incompetent to circulate or witness the signing of petitions under R.C. 2961.01(B). OMA has indicated that it is no longer pursuing that allegation.

. We deny OMA’s motion to strike the committee’s constitutional challenge on the grounds of waiver. Generally, the question of a statute’s constitutionality must be raised at the first opportunity. State v. Quarterman, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15. However, OMA has identified no decisional support for the proposition that in a civil case, an opposing party who does not plead the unconstitutionality of a statute as an affirmative defense waives the argument.

. This number does not include the invalidated signatures on the part-petitions submitted by Jackson and Veliquette, so as to avoid double-counting.